## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, )
)
v. )
) 2:17-cr-00138
LEONARD RUSHIN-FELDER, et al., )
)
Defendants. )
)
)

## OPINION

**Mark R. Hornak, Chief United States District Judge**

On May 23, 2017, a federal grand jury returned a three-count indictment charging Defendants Leonard Rushin-Felder and Mark Ridley with conspiracy to possess with intent to distribute a quantity of heroin in violation of 21 U.S.C. § 846 and possession with intent to distribute a quantity of heroin in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C). (ECF No. 19). Defendant Rushin-Felder was also charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (*Id.*).

Now before the Court are Defendant Rushin-Felder's Motion to Suppress Evidence Seized During Arrest (ECF No. 60) and Defendant Ridley's Nunc Pro Tunc Motion to Suppress Evidence (ECF No. 63). Both Defendants seek to suppress all evidence obtained during a search of Rushin-Felder's vehicle on April 25, 2017, contending that the law enforcement officers on the scene lacked probable cause to detain the Defendants and search Defendant Rushin-Felder's vehicle without a warrant. Counsel for both Defendants and the Government fully briefed the

issue. (ECF Nos. 60, 63, 71). The Court held an evidentiary hearing and oral argument on October 24, 2018. (ECF No. 81). Upon request from counsel for both Defendants, the Court granted extensions of time for defense counsel to obtain a hearing transcript and submit supplemental briefing. (ECF No. 82). Counsel for Defendant Ridley did not submit a supplemental brief. The Court concludes that there was sufficient probable cause for the officers to believe that Rushin-Felder's vehicle was transporting contraband and therefore both Motions will be denied.

## I.    **FACTUAL FINDINGS**

Testifying for the Government at the evidentiary hearing were FBI Special Agent Leonard Piccini and Detective James Caterino of the Borough of Munhall and Borough of West Homestead Police Departments. Neither Defendant called a witness during the hearing.

"It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Harris*, 884 F. Supp. 2d 383, 387 (W.D. Pa. 2012) (internal citations and quotations omitted). Except where specifically noted, the Court found the testifying witnesses to be credible. The Court makes the following factual findings based upon the testimony given at the suppression hearing.

### a.  Special Agent Piccini's Testimony

Special Agent Leonard Piccini ("SA Piccini") of the Federal Bureau of Investigation was involved in an FBI task force investigation into drug trafficking activity occurring in Western Pennsylvania. (Evidentiary Hrg. Tr. ("Tr.") at 16:19–17:6). As part of that investigation, federal law enforcement officers obtained and executed a search warrant for the premises at 5108

-2-

Glenwood Avenue in the Hazelwood neighborhood of Pittsburgh, Pennsylvania. (*Id.* at 17:7–17). The search of the home and all subsequent events relevant to this case, unless otherwise noted, occurred on April 25, 2017.[1] The search warrant authority began at 6:00 a.m. that morning, and the search of Rushin-Felder's vehicle occurred around 7:00 p.m. that evening. (*Id.* at 47:3–17).

Richard Ruby resided at 5108 Glenwood Avenue. (Tr. at 17:20–22). That house had been under surveillance on previous occasions, and law enforcement officers had observed individuals pull into a parking area on the side of Mr. Ruby's home to buy heroin. (*Id.* at 24:3–25:1). The search of Mr. Ruby's home yielded firearms, heroin, and a cell phone. (*Id.* at 18:3–8). Law enforcement officers obtained a warrant to search the recovered cell phone, (*id.* at 18:9–11), and based on the content of text message conversations on the phone, SA Piccini concluded that an individual named "Sharkky" was supplying Ruby with heroin for redistribution. (*Id.* at 18:24–19:19). SA Piccini testified that Detective James Caterino had personal knowledge that "Sharkky" was Defendant Ridley, a purported heroin dealer. (*Id.* at 19:23–20:8).

SA Piccini personally reviewed the text messages that were on Ruby's phone and read several of the exchanges between Ruby and "Sharkky" during his testimony. (Tr. at 21:14–29:25). The conversations reviewed and read by Piccini describe four discrete drug transactions in which Ruby arranged to buy heroin from "Sharkky." (*Id.*). SA Piccini confirmed that his experience with investigating drug trafficking in the Pittsburgh area informed his conclusion that the text messages that he reviewed were referencing heroin transactions. (*Id.* at 36:17–39:14). These transactions took place in early April, 2017, and all involved Ruby paying hundreds of

[1] In one exchange during the evidentiary hearing the AUSA on behalf of the Government asked SA Piccini the following: "On the date in which you searched Mr. Rushin-Felder's car on April 24th, where did that car pull into?" (Tr. at 25:2–4). There was no other testimony offered by any party during the evidentiary as to when the events in question took place. All parties in their briefs describe the events at issue as taking place on April 25, 2017. (ECF No. 60 at 1; ECF No. 63 ¶ 1; ECF No. 71 at 2). The Government's Indictment Memorandum also lists the offenses as occurring on April 25, 2017. (ECF No. 20). Given that this date appears to be undisputed in the parties' briefing, the Court finds and concludes that the Government misspoke in the referenced question and that the execution of the search warrant and search of Mr. Rushin-Felder's vehicle took place on April 25, 2017.

-3-

dollars for heroin, "Sharkky" delivering the heroin to Ruby's home at 5108 Glenwood Avenue (referred to as "G wood" in the text messages), and included "Sharkky" sending a text message announcing his arrival at Ruby's home. (*Id.*).

Piccini then began texting "Sharkky" from Ruby's phone and mimicking the language in the prior texts in order to impersonate Ruby and set up a drug buy from "Sharkky." (Tr. at 30:2–5). The Court concludes based upon Piccini's testimony and the content of the exchanged messages between Piccini and "Sharkky" that "Sharkky" believed he was communicating with Ruby as he was texting with Piccini. At the time he was conversing with "Sharkky," SA Piccini was positioned at the corner of Glenwood Avenue and Johnston Avenue, approximately sixty yards from Mr. Ruby's home at 5108 Glenwood Avenue. (*Id.* at 34:8–14). Additional federal and local law enforcement officers were positioned around the perimeter of Ruby's home at the time. (*Id.* at 34:15–19). After arranging a heroin transaction, "Sharkky" asked SA Piccini (posing as Ruby) if he's "up the crib," that is, at his home at 5108 Glenwood Avenue. (*Id.* at 33:15). Piccini responded "yep" and "Sharkky" replied "Bet bouta pull up," (*id.* at 33:16–17), which the Court interprets as "Sharkky" conveying that he would soon arrive at Ruby's house at 5108 Glenwood Avenue. The final message, received around 7:00 p.m., was from "Sharkky" to Piccini and it read "Here." (*Id.* at 34:4). A black Jeep pulled into a parking spot next to the left side of the residence almost simultaneously with Piccini's receipt of the "Here" message from "Sharkky," (*id.* at 34:20–35:14), and SA Piccini signaled to his team to "take the vehicle and secure it." (*Id.* at 35:4–5).

SA Piccini could not say for sure whether the parking spot that the Jeep pulled into was on the residence's property, or whether the parking spot was part of an adjacent church parking lot. (Tr. at 44:13–19). However, SA Piccini testified that, during his numerous surveillances of

-4-

the neighborhood, he had never observed someone park in that spot and then go into the church. (*Id.* at 44:5–8). He also testified that no other vehicle (aside from police vehicles) utilized that parking lot during the thirteen-hour window in which the search warrant was in effect on the day in question. (*Id.* at 47:3–48:12).

SA Piccini gave the signal to "take" the Jeep because he believed that the individual that he was texting with was in the Jeep that pulled up to the residence and that heroin would be found in the Jeep. (Tr. at 35:15–22). Other than the text message, SA Piccini did not observe the vehicle's occupants give any type of identifying signal as they approached, such as sounding the car's horn or waving. (*Id.* at 45:21–46:10). The Jeep's windows were tinted and SA Piccini could not see inside of the vehicle as he approached. (*Id.* at 36:2–5). SA Piccini admitted that, throughout the day that he was texting with "Sharkky" and his team was staking out Ruby's residence, he and his team "didn't know what [they] were looking for." (*Id.* at 41:13–16). He also confirmed that the driver of the Jeep was not observed committing any driving infractions and that the purpose of "taking down the vehicle was to find out who was in the vehicle and what was in the vehicle according to the[] text messages[.]" (*Id.* at 42:5–13).

b. Detective Caterino's Testimony

Detective James Caterino ("TFO Caterino") is a police officer employed by the Borough of Munhall and was assigned to the same Western Pennsylvania opioid task force as SA Piccini. (Tr. at 52:3–13). TFO Caterino was the "intelligence lead" on the criminal investigation involving Richard Ruby. (*Id.* at 52:14–19). Caterino was involved in a previous heroin distribution investigation in early 2016 in which Defendant Ridley was implicated, and he had become familiar with Mr. Ridley during the course of that investigation. (*Id.* at 53:2–21). TFO Caterino also had previous knowledge of Mr. Ridley because they are "from the same area," and

because he had observed him on numerous occasions he was "very familiar" with what he looks like. (*Id.* at 54:1–13). SA Piccini provided TFO Caterino with the name of a suspected heroin supplier after recovering Richard Ruby's cell phone—"Sharkky." (*Id.* at 54:17–21). From his involvement in the 2016 investigation, and from growing up with Mr. Ridley, TFO Caterino confidently concluded that "Sharkky" was Defendant Ridley. (*Id.* at 55:5–23).

TFO Caterino was one street away from Ruby's residence when he received the "all go" signal from SA Piccini. (Tr. at 56:15–18). He pulled in behind the target vehicle, (*id.* at 56:22–23), which was stopped and parked at the time, (*id.* at 64:9–10). TFO Caterino did not follow his typical procedure in conducting a traffic stop prior to searching the vehicle. (*Id.* at 64:8–10). This was because, in TFO Caterino's view (which the Court agrees with based on the testimony of SA Piccini and TFO Caterino) this was not a "traffic stop," rather it was a "bust" operation—a vehicle search. (*Id.* at 64:1–12).

After parking behind the vehicle, TFO Caterino approached the rear passenger side of the vehicle with his firearm drawn. (Tr. at 57:6–11). He also could not see who was inside of the vehicle due to the tinted windows. (*Id.* at 57:12–20). TFO Caterino then opened the rear passenger side door and immediately recognized Defendant Ridley in the back seat with multiple cell phones on his lap. (*Id.* at 58:1–8). Ridley was removed from the vehicle, handcuffed, and handed over to other task force officers on the scene. (*Id.* at 58:11–15). The other occupants of the vehicle—Defendant Rushin-Felder and Howard Morrison—were also removed, detained, and patted down. (*Id.* at 58:19–21, 59:19–25). None of the occupants were free to leave the scene upon being removed from the vehicle. (*Id.* at 66:22–23).

TFO Caterino testified that another officer called the cell phone corresponding to "Sharkky" from Ruby's phone, and one of the cell phones that was on Ridley's lap rang. (Tr. at

58:24–59:15). According to TFO Caterino, this call took place after the vehicle occupants were detained but *prior* to the search of the vehicle. (*Id.*) Caterino was challenged on this point on cross-examination, (*id.* at 70:18–71:8,73:6–22), because the Government stated in its Response to the Defendants' Motions stated that the officers on the scene did not call "Sharkky" until after the search had concluded. (ECF No. 71 at 4). The Court acknowledges that the Government's representation in its Response is contrary to Caterino's testimony and that TFO Caterino was challenged on cross-examination after stating "Yes" in response to defense counsel asking him if the Government's sequence of the events was correct. (Tr. at 70:18–25). Nonetheless, the Court finds and concludes that TFO Caterino's testimony was otherwise credible and therefore adopts Caterino's account of the sequence. Caterino immediately clarified that he had misheard counsel's question and, after reading the Government's Response, affirmatively stated that his recollection was that the call was placed prior to the search taking place. (*Id.* at 71:1–8, 73:14–15). The Court credits the fact that Caterino was present on the scene, personally involved with the search, and witnessed the cell phone ring. The contrary sequence in the Response filed by the Government is certainly not irrelevant to the credibility of Caterino's testimony. However, the Court recognizes that it was authored by an Assistant United States Attorney who, unlike TFO Caterino, did not have personal knowledge of what occurred during the search. There is no evidence that Caterino authored, ratified, or otherwise adopted the Government's recitation of the events—which were presented as a summary of facts without citations to support for those facts. Therefore, TFO Caterino's testimony will be given credible weight, and aside from the contrary representation in the brief from the Government, the Court has no reason to doubt Caterino's account of the events.[2]

---

[2] The Government offered no explanation during the hearing as to why the papers that it filed with the Court describe a different sequence. In the Court's estimation, considering the record as a whole, along with the Court's

TFO Caterino detected a "strong odor of marijuana" as he approached the vehicle. (Tr. at 60:10–13). Some marijuana was found on Howard Morrison as he was patted down and some money was recovered from one of the vehicle occupants, though TFO Caterino could not remember from whom the money was recovered. (*Id.* at 60:7–9, 60:16–17). A search of the vehicle was conducted at this point, and nothing was found in "plain view" in the passenger compartment of the vehicle. (*Id.* at 61:1–2). A firearm was recovered from the door panel on the driver's side of the vehicle and heroin was recovered from the door panel on the passenger's side. (*Id.* at 61:4–6). TFO Caterino testified that these areas were searched because they are common areas where narcotics and weapons are stored. (*Id.* at 61:7–9). The areas from which the guns and heroin were recovered were located behind panels in the door. (*Id.* at 61:12–22). According to TFO Caterino, these panels are held in place by "clips" and are easily removable without the use of special tools. (*Id.* at 61:17–62:7). No warrant was obtained to search the vehicle. (*Id.* at 67:17–19). It is undisputed that the vehicle was registered to Defendant Rushin-Felder and Cruisha Felder. (ECF No. 60 at 2; ECF No. 63 ¶ 6; ECF No. 71 at 4).

## II.  ANALYSIS

Evidence seized in violation of a defendant's Fourth Amendment rights may not be admitted in a criminal prosecution against the defendant. *See generally Mapp v. Ohio*, 367 U.S. 643 (1961). It is well-established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Since at least 1925, the Supreme Court has recognized a so-called "automobile exception" to the Fourth

---

assessment of the in-court testimony that it personally observed, the fair conclusion is that the Government was careless in drafting its statement of facts in ECF No. 71, rather than that Caterino's testimony was false.

Amendment's warrant requirement, whereby a police officer may conduct a warrantless search of a vehicle if the officer has probable cause to believe that the vehicle is transporting contraband or other "illegal merchandise." *See Carroll v. United States*, 267 U.S. 132, 153–54 (1925). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). These include enclosed "repository" areas within the passenger compartment, *California v. Carney*, 471 U.S. 386, 391–92 (1985) (collecting cases), and the rule in *Ross* applies regardless of who claims ownership of the packages or containers to be searched within a vehicle, *Wyoming v. Houghton*, 526 U.S. 295 (1999). The Government bears the burden of establishing, by a preponderance of the evidence, that the automobile exception to the warrant requirement applies. *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014).

### a. Standing to Challenge the Search

"Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). In order to have standing to challenge a search, an individual must be able to demonstrate that he had a reasonable expectation of privacy in the place or property searched. *Minnesota v. Olson*, 495 U.S. 91, 95–97 (1990). Passengers of a vehicle that neither own nor lease the vehicle generally do not have a reasonable expectation of privacy in the interior of the vehicle. *Rakas*, 439 U.S. at 148–49; *accord United States v. Baker*, 221 F.3d 438, 441–42 (3d Cir. 2000) ("It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car.").

As a preliminary matter, it is undisputed that the Jeep was jointly registered to Defendant Rushin-Felder and Cruisha Felder. As the owner and operator of the vehicle, Rushin-Felder had a

reasonable expectation of privacy in the interior of the vehicle and standing to challenge the search. *See United States v. Mosley*, 454 F.3d 249, 252–53 (3d Cir. 2006) ("Passengers in cars, *unlike owners or licensees*, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding.") (emphasis added). Defendant Ridley's standing to challenge the search is another matter.

In the Court's estimation, both the Government and Defendant Ridley appeared to have missed the mark regarding Ridley's standing issue. Ridley conceded at oral argument that he would have no standing to challenge the search of the vehicle if the search was pursuant to the "automobile exception" of the Fourth Amendment's warrant requirement. (Tr. at 14:7–11). Ridley instead characterizes this incident as a prolonged "traffic stop." A traffic stop must be limited in scope and duration to the purpose of the stop. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). According to Ridley, his removal from the car, detention, and subsequent search of the vehicle were outside of the scope of a routine traffic stop, and thus any evidence seized as a result of his illegal detention should be suppressed as the fruit of a poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

The problem for Ridley is that the testimony from the officers that conducted the search unequivocally establishes that this was *not* a routine traffic stop. Neither TFO Caterino nor SA Piccini claimed that Rushin-Felder had committed any driving infractions that would justify the initiation of a traffic stop. And they did not need to. For one, the vehicle was parked on its driver's own volition when the law enforcement officers approached to search it—it was never "pulled over" by the police or otherwise stopped by the police in or from traffic. The officers' testimony was also clear that they initiated the search because they believed that they had

sufficient probable cause to believe that the vehicle that pulled up next to the 5108 Glenwood Avenue residence was transporting heroin.

Undoubtedly, Ridley did not have a reasonable expectation of privacy in the interior of Rushin-Felder's Jeep, and thus a search of the Jeep could not implicate Ridley's Fourth Amendment rights. *Baker*, 221 F.3d at 441–42. However, if the initial *seizure* of Ridley was illegal then Ridley could have standing to challenge the admissibility of the evidence seized from the Jeep as illegal fruits of that seizure. *See Mosley*, 454 F.3d at 251. The Third Circuit's detailed and thorough Opinion in *Mosley* clarifies when a passenger in a vehicle would or would not have standing to object to the search of that vehicle.[3] Essentially, the Third Circuit concluded that if the initial stop of a vehicle and seizure of its occupants was illegal then *any occupant* of the vehicle has standing to challenge the admissibility of the evidence obtained from the vehicle unless the prosecution can show that the taint of the illegal stop had been purged. *Id.* The Court will note that this argument was not raised by Defendant Ridley, and Defendant Ridley's "traffic stop" argument is meritless because there are no facts in this case that would support that law enforcement carried out a "traffic stop" rather than a vehicle search.[4]

Even assuming that a *Mosley*-style argument could have been meritorious in this case,[5] Ridley would nonetheless need to demonstrate that his initial seizure and the seizure of the

---

[3] The Government cites to *Mosley* only for the proposition that passengers generally have no reasonable expectation of privacy in vehicles that they do not own. (ECF No. 71 at 5). While true, the Court finds it a bit perplexing as to why the Government would fail to discuss or distinguish the more pertinent portions of that opinion, given that the ultimate conclusion of the Third Circuit was that the passenger in *Mosley did* have standing to challenge the admission of the evidence seized from the vehicle. 454 F.3d at 269. That being said, this case was not cited or discussed by Ridley at all. In the Court's estimation, the facts and circumstances of *Mosley* are at least somewhat analogous to the facts presented by this case, and at minimum, should have warranted a discussion from the parties.

[4] The Court reiterates that counsel for Ridley and Rushin-Felder requested the opportunity to submit supplemental briefs following the evidentiary hearing and the Court ordered them to do so. (ECF No. 82). Counsel for Defendant Ridley never submitted a supplemental brief.

[5] *Mosley* involved a traffic stop, but the search of the vehicle in this case was clearly based upon the so-called "automobile exception" to the Fourth Amendment's warrant requirement. Though, in the Court's estimation, *Mosley*

-11-

vehicle was illegal. *Mosley*, 454 F.3d at 264–65. To do so, he would need to demonstrate that the law enforcement officers lacked probable cause to believe that vehicle in which he was travelling was transporting contraband, and he would need to prove that the law enforcement officers lacked reasonable suspicion or probable cause to detain him upon law enforcement officers finding him in the backseat of the vehicle. These determinations dovetail with Rushin-Felder's arguments for suppression, so the Court will revisit the issue of Ridley's standing after its analysis as to whether there was probable cause to search Rushin-Felder's Jeep and detain its occupants without a warrant.

b. Probable Cause for the Search

The dispositive issue for Rushin-Felder's Motion is whether there was sufficient probable cause for the officers to believe that the vehicle that they searched contained heroin. "Probable cause" has no particular or precise definition, but "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Probable cause is a "totality-of-the-circumstances" inquiry and a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232–33 (1983). The historical facts leading up to the search are considered as "viewed from the standpoint of an objectively reasonable police officer" in determining whether those historical facts "amount to . . . probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). If these historical facts demonstrate that there was a "fair probability that contraband or evidence of a crime" would have been found in the vehicle, then

would likely apply broadly to any setting in which a vehicle occupant is illegally seized prior to a vehicle search, the Court reaches no conclusion on this point because it is not determinative of the outcome of the issue before the Court and because no party raised such an argument in their briefing or during oral argument.

-12-

there was probable cause to search the vehicle. *Donahue*, 764 F.3d at 301 (quoting *Gates*, 462 U.S. at 238).

The heroin and firearm were found within the driver's side door panel of Rushin-Felder's vehicle. Ridley argued during the suppression hearing that this door panel was not in the "passenger compartment" of the vehicle and that the officers' warrantless search of this area of the vehicle was excessive. This argument is directly foreclosed by *Ross* and its progeny. If the officers had probable cause to believe that Rushin-Felder's vehicle was transporting heroin, then the officers could search any and every part of the vehicle that could contain the heroin. *Ross*, 456 U.S. at 825. Heroin can be compactly secreted in nearly any area, hidden or otherwise, of a vehicle and TFO Caterino testified that these were "[c]ommon areas where narcotics and weapons are stored." (Tr. at 61:7–9). Ridley's suggestion that probable cause to believe that the vehicle was transporting contraband would only authorize searches of areas that are "in the open" or in plain view is simply incorrect.

The Court concludes, based on the testimony of SA Piccini and TFO Caterino, that there was a sufficient factual basis for the law enforcement officers on the scene to conclude that there was probable cause that Rushin-Felder's vehicle was transporting heroin. The initial search of Richard Ruby's house at 5108 Glenwood Avenue produced evidence of heroin trafficking, namely, firearms and heroin. The messages and other communications on Richard Ruby's phone provided further grounds for the law enforcement officers to conclude that Ruby was buying and distributing significant quantities of heroin from his residence.[6]

With a solid basis to believe that he now possessed a drug dealer's cell phone, SA Piccini communicated with an individual that was believed to be a heroin distributor in order to set up a

---

[6] The Court found SA Piccini's testimony regarding the import of the slang terms used by the communicants to be credible based on SA Piccini's experience with investigating heroin distribution conspiracies in the Western Pennsylvania region. (*See* Tr. at 37:12–21, 39:5–14).

-13-

proposed drug buy. SA Piccini reasonably concluded that this individual—"Sharkky"—was a drug dealer due to the content of the previous messages exchanged between Ruby and "Sharkky" and his interpretation of those messages based on his experience as a law enforcement officer. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (explaining that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them" in considering the "totality of the circumstances" informing a probable cause determination). But that is not all. Another member of the task force, TFO Caterino, had grown up in the same town as Defendant Ridley and had previously investigated Ridley for drug-related crimes. Based on these experiences, TFO Caterino informed SA Piccini that "Sharkky" was Defendant Ridley, a purported heroin distributor.

A series of text messages were exchanged in which SA Piccini, posing as Ruby, requested that Ridley deliver a substantial quantity of heroin to his home. SA Piccini personally observed a black Jeep pull into a spot next to the 5108 Glenwood Avenue residence that was previously observed to have been used during heroin transactions. Contemporaneously with the Jeep arriving, Piccini received a text message of "Here." No other vehicles (aside from police vehicles) were observed utilizing that parking spot during the approximately thirteen-hour duration of the search warrant in this case. During the conversation with Ridley, Piccini (posing as Ruby) instructed Ridley to arrive at a 1) specific location (the 5108 Glenwood Avenue residence), 2) as soon as possible, 3) with a significant quantity of heroin. Given that this black Jeep arrived at the agreed-upon location shortly after "Sharkky" indicated that he was about to arrive, there was more than sufficient cause for the agents to believe that the individual with whom Piccini had been communicating was inside of the Jeep with a significant quantity of

heroin—particularly because "Sharkky" announced his arrival ("Here") at the same time that SA Piccini and other surveilling officers observed the vehicle pull into the target location.

Rushin-Felder argues that the police were on a "fishing expedition" and had simply gotten lucky that the first vehicle that they approached happened to be Rushin-Felder's Jeep. He characterizes this vehicle search as the police haphazardly pouncing on the first vehicle to arrive in an infrequently utilized parking lot. Not so. There are several faulty premises in Rushin-Felder's characterization of the events. First, Rushin-Felder suggests that 5108 Glenwood Avenue was merely a "normal residential setting" and thus the Jeep pulling into the lot next to the house should have aroused no suspicion. This ignores the facts that law enforcement officers had observed drug transactions occurring at the address on previous occasions and, just hours before the events at issue here, had recovered heroin and firearms from the residence pursuant to a search warrant. Rushin-Felder's characterization of the officers' conduct also ignores the conversations between law enforcement and a suspected drug dealer arranging for a drug buy at that specific location, and the arrival of a vehicle simultaneously with the suspected drug dealer indicating that he had arrived at the same location. These facts more than sufficiently laid the foundation for police to conclude that the Jeep that arrived at 5108 Glenwood Avenue was transporting contraband, and thus they could search the vehicle without a warrant. *See, e.g.*, *United States v. Cobb*, 483 F. App'x 719, 723–24 (3d Cir. 2012) (upholding the warrantless search of a trunk of a car where officers had probable cause, based on electronic and physical surveillance, to believe that there was cocaine in the car); *United States v. Mainor*, 393 F. App'x 10, 17 (3d Cir. 2010) (similar).

Relatedly, Rushin-Felder's assertion that "[t]here was no testimony that upon parking the vehicle, that the vehicle occupants gave any signal or otherwise attempted to communicate that

the vehicle occupants were the arresting officers' expected visitor(s)," (ECF No. 83 at 2), is of no avail to him under these facts. It may be true that *other than* the contemporaneous text message of "Here" as the Jeep pulled into the residence the vehicle occupants did not otherwise announce their presence. But that is a pretty big "other than." The prior messages exchanged contemplate a meet-up at a specific place. A vehicle arrived *at that specific place* at the same time that "Sharkky" communicated via text that he also arrived *at that specific place*. This might not establish to an absolutely certainty that the individual that SA Piccini was setting up a drug deal with was in the vehicle that pulled up to 5108 Glenwood Avenue—but it is more than sufficient to establish that there was probable cause for the officers on the scene to so conclude. *See Gates*, 462 U.S. at 246 ("[P]robable cause does not demand the certainty we associate with formal trials.").

Finally, Rushin-Felder makes much ado about the fact that SA Piccini testified that "[t]hroughout that day, throughout this period of these text messages, we didn't know what we were looking for." (Tr. at 41:14–16). This statement was in response from a question from defense counsel regarding whether any law enforcement officer was following the Jeep prior to it pulling into the Glenwood address. (*Id.*). Viewed properly in context, SA Piccini's statement is not nearly as consequential as Rushin-Felder argues that it is. SA Piccini candidly admitted that, at the time that the text messages were being exchanged, they did not know what type of vehicle "Sharkky" was in. But that is not relevant under these facts. The task force officers were not relying on the characteristics of the vehicle when they concluded that the Jeep that arrived at 5108 Glenwood Avenue was transporting heroin. The task force officers might not have known what specific vehicle they were looking for, but they "had an idea of who [they] were looking for"—Mark Ridley, a.k.a., "Sharkky." (*See* Tr. at 69:6–12). Based on Piccini's conversation with

"Sharkky," the police had probable cause to believe that, not only was "Sharkky" in the vehicle that arrived, but that he was also transporting a large quantity of heroin because they had set up just such a drug deal by text messaging. It would not have mattered if Rushin-Felder was driving a black Jeep, a blue Chevrolet, or a green Ford, since the officers were relying on their communications with "Sharkky," his announcement via text that he had arrived, and the contemporaneous arrival of a vehicle in concluding that contraband would be found in the vehicle that they eventually seized and searched. The characteristics of Rushin-Felder's vehicle—and the officer's ignorance of them—is irrelevant under these facts.[7]

c. Validity of Seizures

Seizures occur when an officer restrains the liberty of a citizen through the application of physical force or when the citizen submits to an assertion of police authority. *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *California v. Hodari D.*, 499 U.S. 621, 626–28 (1991)). None of the vehicle occupants were free to leave after they were removed from the vehicle and detained, and accordingly the Court concludes that all of the vehicle occupants were "seized" for Fourth Amendment purposes when they were removed from the vehicle. Brief investigative detentions are permissible under the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). But such "an investigative detention must be temporary and last no longer than is necessary to

---

[7] Certainly, had the officers on the scene known or had reason to know that "Sharkky" would be arriving in a black Jeep then the arrival of said Jeep at the target address would have further bolstered the officers' support for their probable cause. Likewise, had they known or had reason to know that "Sharkky" would have been arriving in a different vehicle, the officers' decision to seize and search Rushin-Felder's black Jeep may have been unreasonable. But the record before the Court is uncontroverted in that the officers on the scene had no knowledge as to what type of vehicle that "Sharkky" would be arriving in, nor would they need to have in order to establish that they had probable cause to search the Jeep. It is not as if the officers decided to stop cars driving by Ruby's house at random until they found the car that "Sharkky" was in. Here, Ridley and Rushin-Felder effectively identified the vehicle to the officers by arriving and parking at the agreed-upon location and by Ridley announcing his arrival via text.

-17-

effectuate the purposes of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Else, probable cause—rather than reasonable suspicion—of criminal activity is necessary to justify a prolonged seizure. *Wardlow*, 528 U.S. at 126.

The Court need not determine whether the detention of Defendants rose to the level of a *de facto* arrest because the Court concludes that there was sufficient probable cause to authorize a warrantless arrest of Ridley and Rushin-Felder.[8] *See Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause[.]"). A warrantless arrest is permissible if "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *United States v. Kithcart*, 134 F.3d 529, 531 (3d Cir. 1998) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). For the reasons discussed above, there was probable cause to believe that heroin would be found in the Jeep that arrived at 5108 Glenwood Avenue. There was sufficient probable cause to arrest Ridley for a violation of 21 U.S.C. § 841(a)(1) because SA Piccini's conversation with "Sharkky" evidenced "Sharkky's" intention to sell a quantity of heroin that he possessed, and based on his knowledge and familiarity with Ridley's appearance, TFO Caterino was able to confirm his earlier belief that "Sharkky" was Ridley as soon as he found Ridley in the backseat.

---

[8] It appears to the Court that, until the Defendants were placed under arrest following the discovery of the drugs and firearm, that their seizures had not risen to the level of a *de facto* arrest. As explained by the Third Circuit, "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) (quoting *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995)). "Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Johnson*, 592 F.3d at 448. The minimal and temporary restraint of the Defendants here was justified by an interest in securing the scene and investigating the alleged criminal activity that they had probable cause for believing the Defendants committed.

-18-

The Court also rejects Rushin-Felder's argument that police had no probable cause to detain him because "Sharkky" was the target of the investigation and because Rushin-Felder was not observed committing any crimes. Rushin-Felder need not have been personally observed committing a crime for the law enforcement officers to have probable cause to believe that he had committed or was committing a crime. *See Gates*, 462 U.S. at 243 n.13 ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."). "[I]nnocent behavior frequently will provide the basis for a showing of probable cause." *Id.* And, contrary to Rushin-Felder's characterization, he did not "*simply* dr[i]ve his vehicle into the parking lot." (ECF No. 60 at 3) (emphasis added). He drove his vehicle to a residence from which law enforcement officers observed heroin transaction taking place on previous occasions and from which firearms and heroin were recovered just hours prior. As discussed above, the police officers had ample reason to believe that the Jeep that arrived at 5108 Glenwood Avenue was transporting heroin. Rushin-Felder was found in the driver's seat of that Jeep as it arrived. This is a sufficient basis for law enforcement officers to conclude that Rushin-Felder was driving the vehicle and it was under his control. Officers on the scene had a basis to conclude that Ridley thought he was selling heroin to Richard Ruby at his house. Rushin-Felder drove him to that house. There *could have* been innocent explanations for why Rushin-Felder drove Ridley to 5108 Glenwood, but probable cause does not require certainties. It would have been reasonable for officers on the scene to conclude that, by virtue of driving Ridley to the proposed meetup stop for the drug buy, Rushin-Felder had knowledge of Ridley's plans and had conspired with Ridley to assist him in selling heroin.

TFO Caterino also detected a strong odor of marijuana as he approached the vehicle and one of the officers on the scene recovered marijuana from another occupant. These observations

-19-

in and of themselves would give TFO Caterino and the other officers on the scene sufficient probable cause to believe that the Jeep's occupants jointly or individually possessed contraband, for which they could be detained for (at minimum) further investigation. *See United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause.").

Ridley argues that the "authority" to detain and search him for evidence ceased after a pat-down of his person and a cursory search of the interior of the vehicle yielded no evidence. (ECF No. 63 ¶ 17). As discussed, there was a sufficient basis to arrest Ridley as soon as he was observed in the backseat of the Jeep, so this argument is meritless. But, even if law enforcement would not have had probable cause to arrest Ridley, this argument would still fail. Once the police officers had probable cause to believe that the Jeep that pulled up to 5108 Glenwood Avenue was transporting heroin, they were authorized to search *any area* of the vehicle that may contain contraband. *Ross*, 456 U.S. at 825; *accord Donahue*, 764 F.3d at 300. This would include the door panels where the gun, drugs, and cash were eventually found. *Carney*, 471 U.S. at 391– 92.

### d. Defendant Ridley has no standing to challenge this search

Because the Court concludes that there was sufficient probable cause for the law enforcement officers to search Rushin-Felder's Jeep without a warrant and to detain both Defendant Rushin-Felder and Ridley as they did so, the Court concludes that Defendant Ridley—as a passenger in a vehicle that he did not own—lacked standing to challenge the search because it followed a legally authorized seizure of the vehicle and its occupants. *Rakas*, 439 U.S. at 149. Even if Ridley did have standing to challenge the search of the vehicle, such a challenge

would fail for the same reasons that Defendant Rushin-Felder's challenge fails. As explained above, there are ample facts that demonstrate that the officers had probable cause to believe that 1) the vehicle that arrived at 5108 Glenwood Avenue would be transporting heroin and an individual intending to sell that heroin; 2) that Defendant Ridley was the individual that SA Piccini was surreptitiously communicating with over text; and 3) that Defendant Rushin-Felder had conspired with Ridley to aid in his attempt to sell heroin by driving him to the agreed-upon meeting spot for a drug transaction. The officers were thus justified in performing a warrantless search of Defendant Rushin-Felder's vehicle and detaining all occupants of that vehicle as they did so.

\* \* \*

## III. CONCLUSION

The Court concludes that there was a sufficient factual basis for the officers to have probable cause to believe that the vehicle that arrived at 5108 Glenwood Avenue was transporting heroin and that Defendants Ridley and Rushin-Felder conspired to distribute said heroin. The Government has demonstrated by a preponderance of the evidence that the "automobile exception" to the Fourth Amendment's warrant requirement applies to the search of Defendant Rushin-Felder's Jeep. *See Donahue*, 764 F.3d at 300. For the foregoing reasons, Defendant Rushin-Felder's Motion to Suppress Evidence (ECF No. 60) is DENIED and Defendant Ridley's Nunc Pro Tunc Motion to Suppress Evidence (ECF No. 63) is DENIED.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: April 9, 2019

cc: All counsel of record, Defendants